# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

RASHAD CHANDLER,                        )
                                        )
      Plaintiff,                    )
                                        )
vs.                                     )      Civ. No. 2:23-02325-SHM-tmp
                                        )
SERGEANT ROBERT FINE, ET AL.,           )
                                        )
      Defendants.                   )
                                        )

---

### ORDER GRANTING MOTION FOR EXTENSION OF TIME TO FILE AMENDED COMPLAINT (ECF NO. 9), DISMISSING THE AMENDED COMPLAINT (ECF NO. 11) WITH PREJUDICE IN PART AND WITHOUT PREJUDICE IN PART, DENYING LEAVE TO AMEND, DENYING PENDING MOTIONS (ECF NOS. 10 & 12), CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL, AND CLOSING CASE

---

On May 18, 2023, Plaintiff Rashad Chandler, an inmate currently incarcerated at the Riverbend Maximum Security Institution (the "RMSI"), in Nashville, Tennessee,[1] filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 and a motion to proceed *in forma pauperis*. (ECF Nos. 2 & 3.) On June 15, 2023, the Court granted leave to proceed *in forma pauperis* and assessed the civil filing fee pursuant to the Prison Litigation Reform Act, 28 U.S.C. §§ 1915, *et seq.* (the "PLRA"). (ECF No. 7.) On February 23, 2024, the Court entered an order dismissing the

---

[1] *See* Tennessee Department of Correction, Felony Offender Information, https://apps.tn.gov/foil/details.jsp (last accessed Feb. 18, 2025).

complaint with prejudice in part and without prejudice in part and granted leave to amend the claims dismissed without prejudice.  (ECF No. 8 at PageID 106.)[2]

On March 21, 2024, Chandler filed a Motion for Extension of Time for Good Cause Shown requesting an extension of forty-five (45) days to file an amended complaint.  (ECF No. 9.)  On April 29, 2024, Chandler filed a Motion to Set the Matter for Mediation (ECF No. 10.)  On April 29, 2024, Chandler filed an amended *pro se* complaint under 42 U.S.C. § 1983.  (the "Amended Complaint") (ECF No. 11.)  On January 16, 2025, Chandler filed a motion for status of motion to amend.  (ECF No. 12.)

The Amended Complaint (ECF No. 11) and the motions (ECF Nos. 9, 10 & 12) are before the Court.

## I.  MOTION FOR EXTENSION OF TIME (ECF NO. 9)

Chandler represents that he received the Court's February 23, 2024 Order dismissing his complaint and granting leave to amend (ECF No. 8.) on March 4, 2024 (ECF No. 9 at PageID 109.)  Chandler's deadline to file his Amended Complaint was March 15, 2024.  (ECF No. 8 at PageID 107-108.)  Chandler filed the motion for extension on March 21, 2024.  (ECF No. 9.)  Chandler represents that he requires an extension of time to file his Amended Complaint because of reduced library hours, staff shortages, conflicts with library hours, and Chandler's work schedule.  (*See id.* at PageID 111-112.)  For good cause shown, the Motion for Extension of Time (ECF No. 9) is GRANTED.

## II.  AMENDED COMPLAINT

Chandler filed his Amended Complaint on April 29, 2024 (ECF No. 11.)  The Amended Complaint is deemed timely filed.  In the Amended Complaint, Chandler alleges that: (1) he was

---

[2] The claims dismissed without prejudice are for: (1) gross negligence against HCCF Defendants in their official capacities; and 2) for failure to protected against WTSP Defendants in their individual capacities.  (ECF No. 8 at PageID 106.)

transferred from the West Tennessee State Penitentiary (the "WTSP"), in Henning, Tennessee, to the Hardeman County Correctional Facility (the "HCCF"), in Whiteville, Tennessee, on May 14, 2022 (ECF No. 11 atPageID 134-143.) and (2) "3 other inmates…began attacking" Chandler with a "6-inch homemade knife" when Chandler arrived at the HCCF (*Id*. at PageID 145.)  Chandler's forty-nine-page Amended Complaint is construed to allege claims of (1) failure to protect (*Id*. at PageID 124-171.); and (2) gross negligence (*Id*. at PageID 125-171.)

Chandler sues eight (8) Defendants: (1) WTSP Sergeant Robert Fine; (2) WTSP Lieutenant F/N/U Ivory; (3) WTSP Sergeant F/N/U Jones; (4) WTSP Lieutenant F/N/U/ Macklin; (5) WTSP Warden Johnny Fitz (Defendants (1), (2), (3), (4) and (5) are referred to as the "WTSP Defendants"); (6) HCCF Sergeant F/N/U/ Maynard; (7) HCCF Captain F/N/U/ Cochran; and (8) HCCF Warden Hilton Hill, Jr. (Defendants (6) (7) and (8) are referred to as the "HCCF Defendants").   Defendants (1) through (8) are referred to collectively as the "Individual Defendants."  (*Id*. at PageID 124, 125-128.)  Chandler sues the WTSP Defendants in their individual capacity only.  (*Id*. at PageID 125-128.)  Chandler sues the HCCF Defendants in their official capacity only.  (*Id.*)

Chandler seeks: (1) service of process on the Defendants; (2) a jury trial; (3) fifty thousand dollars ($50,000.00) in punitive damages from Fine, Ivory, Fitz, Jones, and Macklin; (4) fifty thousand dollars ($50,000.00) in compensatory damages from Fine, Ivory, Fitz, Jones, and Macklin; (5) ten thousand dollars ($10,000.00) in punitive damages from Cochran, Hill, and Maynard; (6) ten thousand dollars ($10,000.00) in compensatory damages from Cochran, Hill, and Maynard; and (7) other, further or general relief . (*Id*. at PageID 156-157.)

For the reasons explained below: (1) the Amended Complaint (ECF No. 11) is DISMISSED WITH AND WITHOUT PREJUDICE; (2) leave to amend is DENIED; and (3) the

motions to set mediation (ECF No. 10) and for status of motion to amend (ECF No. 12) are

DENIED AS MOOT.

**III.**  **LEGAL STANDARD**

The Court must screen prisoner complaints and dismiss any complaint, or any portion of

it, if the complaint —

> (1) is frivolous, malicious, or fails to state a claim upon which relief may be
> granted; or
> (2) seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A(b); *see also* 28 U.S.C. § 1915(e)(2)(B).

In assessing whether the complaint states a claim on which relief may be granted, the Court

applies the standards under Federal Rule of Civil Procedure 12(b)(6), as stated in *Ashcroft v. Iqbal*,

556 U.S. 662, 677–79 (2009), and in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007).

*Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010).  Under those standards, the Court accepts

the complaint's "well-pleaded" factual allegations as true and then determines whether the

allegations "plausibly suggest an entitlement to relief." *Williams v. Curtin*, 631 F.3d 380, 383 (6th

Cir. 2011) (quoting *Iqbal*, 556 U.S. at 681).  The Court does not assume that conclusory allegations

are true, because they are not "factual," and all legal conclusions in a complaint "must be supported

by factual allegations." *Iqbal*, 556 U.S. at 679.  Federal Rule of Civil Procedure 8 provides

guidance on this issue.  Rule 8 requires a complaint to contain "a short and plain statement of the

claim showing that the pleader is entitled to relief."  It also requires factual allegations to make a

"'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 555

n.3.

Courts screening cases accord more deference to *pro se* complaints than to those drafted

by lawyers.  "*Pro se* complaints are to be held 'to less stringent standards than formal pleadings

drafted by lawyers,' and should therefore be liberally construed." *Williams*, 631 F.3d at 383

(quoting *Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004)).  *Pro se* litigants are not exempt

from the requirements of the Federal Rules of Civil Procedure.  *Wells v. Brown*, 891 F.2d 591, 594

(6th Cir. 1989); *see also Brown v. Matauszak*, 415 F. App'x 608, 612, 613 (6th Cir. 2011)

(affirming dismissal of *pro se* complaint for failure to comply with "unique pleading requirements"

and stating "a court cannot 'create a claim which [a plaintiff] has not spelled out in his pleading'"

(quoting *Clark v. Nat'l Travelers Life Ins. Co*., 518 F.2d 1167, 1169 (6th Cir. 1975))).

## IV.    REQUIREMENTS TO STATE A CLAIM UNDER § 1983

Chandler sues under 42 U.S.C. § 1983.  (ECF No. 11 at PageID 125.)  To state a claim

under § 1983, a plaintiff must allege two elements: (1) a deprivation of rights secured by the

"Constitution and laws" of the United States, and (2) that a defendant caused harm while acting

under color of state law.  *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 150 (1970).

## V.    FACTUAL ALLEGATIONS

Chandler alleges that, during his confinement at the WTSP "from 2010 until 2022", he was

a member of the "Cicero Insane Vice Lord Nation." (ECF No. 11 at PageID 128.)  Chandler has

been a recorded member of this designated "[s]ecurity [t]hreat [g]roup" since 2001, when he

entered the WTSP.[3]  (*Id.*)   Chandler describes the hostility between the Traveling Vice Lords

("TVL") and the Cicero Vice Lords ("CVL")  beginning around 2018, and the "clashes" between

them that had occurred throughout the Tennessee prison system and on the "streets."  (*Id.*)

Chandler estimates that those clashes caused at least twenty serious stabbing[s] and beatings inside

the Tennessee prison system and resulted in more than one hundred CVL members being placed

in administrative segregation at various prisons in Tennessee.  (*Id.*)

---

[3]  It is unclear from the Amended Complaint whether Chandler's use of 2001 was a
typographical error because he states previously that he entered the WTSP in 2010.

Chandler alleges that he and Defendant Fine had a conversation in 2019 about the hostility between the two rival Vice Lord groups and three stabbing incidents in which TVL attacked CVL at HCCF and Trousdale Turner Facility. (*Id.* at PageID 129.) Chandler alleges that the prison system initially "took steps" to keep these two rival groups separated, but that "this did not last long." (*Id.*) Chandler alleges offenders throughout Tennessee are not properly screened before being transferred to participate in institutional programs for offenders who suffer from drug addiction or who have suffered an overdose. (*Id.*) Chandler alleges "incompatible" prisoners participating in the drug program were kept at WTSP and allowed to remain on prison grounds after completing the program because of institutional need. (*Id.* at PageID 130.)

Chandler alleges he was attacked by two TVL members, Leon Bell and Cordaro Hughes, with metal pipes on May 3, 2020. (*Id.*) Chandler was able to fend off the attack without sustaining "serious bodily injury" until six CVL members were able to chase the attackers away. (*Id.*) Bell, one of Chandler's attackers, asked prison authorities to place Bell in protective custody. (*Id.* at PageID 132.) Chandler alleges that, on May 4, 2020, Defendant Fine and other officers came to Chandler's unit and "locked up" Chandler and nine members of his group. (*Id.*) Chandler alleges that Hughes was locked up on the same day. (*Id.*) Chandler alleges he and the CVL members with him were issued disciplinary infractions for: (1) participation in security threat group activity; (2) possession of a weapon; and (3) assault with a weapon with the intention of creating violence. (*Id.*) Chandler and five other CVL members were classified to maximum security. (*Id.*) "During this time, [Bell and Hughes] were sent to [the WTSP's] S[pecial] M[anagement] U[nit] Program." (*Id.*)

Chandler alleges that he left maximum security at the WTSP on May 5, 2022, after he had completed a six-month step-down program. (*Id.*) Chandler alleges that he and five other members of his group were to return to the main compound together, but that Warden Fitz refused to allow

them to return to the compound because a TVL chief, Johnny Peterson, had told Fine that Chandler

and other CVL would be seriously injured or killed if allowed to return to the WTSP main

compound. (*Id*. at PageID 133.)  Chandler alleges Fine came to the "max unit" and informed all

CVL that they would not be released to the WTSP main compound until "Johnny Peterson and the

other members of TVL were transferred" to the HCCF. (*Id.*)

Chandler alleges that, on May 11, 2022, Fine told Chandler and another inmate that a "new

policy" required that they be "shipped" instead of being released to the WTSP main compound.

(*Id.*) While discussing the new policy, Fine told Chandler that Chandler could not be transferred

to Trousdale Turner, HCCF, or any other CoreCivic location because Fine and Warden Fitz had

sent Johnny Peterson and the "rest of the Traveling Vice Lords" to HCCF and Whiteville. (*Id*. at

PageID 134.)  Fine said that "CoreCivic prisons were full of Traveling Vice Lords and that he was

well aware there was [sic] a large number of these enemy gang members at both Hardeman County

and Whiteville." (*Id*.)  Chandler alleges that he "expressed concerns for his safety in the event he

were sent to one of the CoreCivic facilities." (*Id*.)  Chandler alleges that "Fine assured [Chandler]

that [Fine] was well aware of the danger to [Chandler] and that due to those safety concerns, he

could not transfer [Chandler] to Hardeman County or Whiteville Correctional Facility." (*Id*.)

Chandler alleges that Fine said an intelligence alert had been placed on Chandler and, as a result,

Chandler could not be transferred to Hardeman County or Whiteville. (*Id.*)

Chandler alleges that, on May 14, 2022, he "was told … he was being transferred to [the]

[HCCF]." (*Id*.)  Chandler alleges that he "protested[,] refused to pack his belongings[,] [and] told

the property room officer that he could not go to Hardeman County because he had enemies at that

facility and, if he were to be transferred, it would place his life in danger." (*Id*. at PageID 134-

135.)  Chandler alleges that Ivory, Jones, and Macklin came to Chandler's cell. (*Id*. at PageID

135.)  Chandler alleges that as Ivory, Jones, Macklin, and Chandler were walking, Jones pulled

Chandler aside and told him in a hushed tone "they got around your [i]ntel alert." (*Id.*)  Chandler alleges the intelligence alert in TDOC policy prohibits a prisoner from being transferred without the prison commissioner's express approval and shows that an inmate is a security risk or concern. (*Id.*)

Chandler alleges Fine and Fitz manipulated safety protocols to avoid the intelligence alert to have Chandler injured or killed.  (*Id.*)  Chandler alleges he could not have been transferred to HCCF without Fitz' approval and that Fitz' approval could not have been given without Fitz knowing an intelligence alert was active on Chandler that precluded Chandler's transfer to HCCF because his "enemies" were housed there.  (*Id.* at PageID 135-136.)  Chandler alleges that the intelligence alert would have been placed on him around June 2020 and that it would have stated Chandler should not be housed at any facility where there was a high number of TVL and that Chandler should not be housed with Johnny Peterson.[4]

Chandler alleges that both Fitz and Fine "sought to have [Chandler] injured or killed because [Chandler] had been a thorn in Fine's side for many years." (*Id.* at PageID 136.)  Chandler believes Fitz and Fine intentionally placed his life in danger because Chandler had been in more than one hundred incidents ranging from disobedience to violence while at WTSP.  (*Id.* at PageID 136-37.)  Chandler alleges that there is a culture in the Tennessee prison system where guards and administration engage in a "form of sadistic chess" to inflict physical injury and harm on state prisoners by intentionally placing prisoners in or creating hostile living environments.  (*Id.* at PageID 137.)

Chandler alleges he told Ivory an intelligence alert had been placed on him, and he could not be transferred to HCCF.  (*Id.* at PageID 138.)  Chandler alleges Ivory, Jones, and Macklin had

---

[4] Chandler admits that he does not have access to the intelligence report, but claims to know of its existence through his conversations with Fine and Jones.  (*Id.*)

access to the intelligence alert and were prohibited from transferring him. (*Id.*) Chandler alleges Ivory said he would call Fine to confirm. (*Id.* at PageID 139.) Chandler overheard a portion of the conversation between Ivory and Fine through Chandler's cell door. (*Id.*) When Ivory ended his call with Fine, Ivory came back to Chandler's cell to inform him Ivory was putting Chandler on the bus to HCCF and that Chandler would only be on the HCCF compound for three days before being transferred to RMSI to be placed in a staff position. (*Id.*) Chandler alleges that the only reason to transfer him to HCCF, instead of directly to RMSI, is that Fine and Fitz were deliberately attempting to have him injured or killed in violation of the intelligence alert. (*Id.*) Chandler alleges he could only be transferred with the express approval of the commissioner or a coordinator at HCCF, and that approval was not obtained. (*Id.*) Chandler alleges that "[e]ach of these officers, including Lieutenant Ivory[,]" knew Chandler could not be transferred because it is an integral part of their training and security protocols. (*Id.*) Chandler alleges that transferring him to HCCF, where WTSP officials had previously sent Johnny Peterson and other TVL, was a deliberate effort by WTSP "officials" to have Chandler injured or killed. (*Id.* at PageID 140.)

Chandler told Ivory that Chandler's transfer was not going to work because Chandler would not be able to protect himself with more than seventy-five rival gang members at HCCF and that Chandler was likely to be attacked as soon as he set "foot on the compound." (*Id.*) Ivory told Chandler that if he did not pack up his belongings, Chandler would be abandoning his property. (*Id.*) Chandler alleges Ivory deliberately refused to follow TDOC policy about the intelligence alert and joined in the conspiracy with Fine and Fitz to have Chandler injured or killed. (*Id.*)

Ivory and all other officers left for twenty minutes and then the "Lieutenant"[5] returned with six other officers armed with tasers and video cameras. (*Id.*) Jones unlocked Chandler's cell door and Jones, Macklin, and Ivory entered Chandler's cell with tasers drawn. (*Id.* at PageID 141.) Macklin ordered Chandler to submit to handcuffs or Chandler would be tased and extracted for transport to HCCF. (*Id.*) Chandler complied. (*Id.*) Chandler alleges that both Macklin and Jones knew or should have known they were violating TDOC policy about the intelligence alert, and that they knew Chandler's enemies were waiting for him at HCCF. (*Id.*) Chandler alleges Macklin and Jones refused to protect Chandler and forced Chandler into a "kill-or-be-killed scenario." (*Id.*) Chandler alleges the officers could have called Fitz or the commissioner and objected to Chandler's transfer, but failed to do so. (*Id.*)

Chandler was transferred to intake and not allowed to take his personal property. (*Id.*) Chandler was strip-searched, placed in restraints, and placed on the transportation bus with another prisoner. (*Id.* at PageID 141-142.) Chandler alleges the WTSP "officials" knew Chandler and the other prisoner were the subjects of an intelligence alert because they were separated on the transport bus. (*Id.* at PageID 142.) A few hours later Chandler was transferred to a transportation van at the DeBerry Special Needs Facility, a bus changeover area for TDOC. (*Id.*) Chandler advised the officer driving the van that Chandler was concerned for his life and safety, and an intelligence alert had been placed on him. (*Id.*) The officer told Chandler to speak with Maynard when he arrived at HCCF. (*Id.*)

Chandler arrived at the HCCF around 5:00 p.m. on May 14, 2022. (*Id.*) At the HCCF intake area, Chandler "explained to Sergeant Maynard that [my] life was in danger," that an intelligence alert had been placed on him, and that he could not be housed at HCCF due to the

---

[5] Chander refers to Lieutenant Ivory in the surrounding paragraphs, but does not include a last name in this paragraph. (ECF No. 11 at PageID 140.)

number of TVL at HCCF.  (*Id*. at PageID 143.)  Maynard told Chandler that HCCF had recently hired a new security threat group coordinator, but the new coordinator would not start until Monday.  (*Id.*)  Chandler knew at that point how Fine was able to "get around" the intelligence alert because there was no coordinator at HCCF to object to Chandler's placement.  (*Id.*)  Chandler told Maynard that Chandler "desperately needed to speak with someone, anyone, at the facility that could help him."  (*Id.*)  Maynard offered to call Cochran, who was the only officer present at that time, but Cochran's whereabouts were unknown.  (*Id.*)

Maynard told Chandler he could not go into protective custody because a hearing was required, and there was no one at HCCF who could conduct one.  (*Id.* at PageID 143-144.)  Maynard told Chandler that punitive segregation was not available without a disciplinary infraction and that, even if there were an infraction, no cells were available.  (*Id.* at PageID 144.)  Chandler continued to tell Maynard that Chandler had an intelligence alert and could not be housed at HCCF.  (*Id.*)  Maynard told Chandler, "There's nobody here.  [Y]ou'll have to wait till (sic) Monday."  (*Id.*)  Chandler alleges Maynard could have contacted the nearby prison at Whiteville to find a safe location or placed Chandler in punitive segregation despite Chandler's stating that Maynard told Chandler no cells were available.  (*Id.*)

Chandler alleges "someone" had to "override" the security protocols and accept Chandler at HCCF.  (*Id.*)  Maynard offered to take Chandler to the transit unit to wait, but because all of those cells were full, Maynard placed Chandler in Cell 205.  (*Id*.)  After arrival at his cell, Chandler alleges that he "spotted an old acquaintance in cell 110 and went down to speak with him.  The two men were in the cell for approximately five minutes when three other inmates [the "Assailants"] rushed in and began attacking [Chandler] … with [a] 6-inch homemade knife … [Chandler's] acquaintance, who lived in the cell, was allowed to exit without being assaulted."

(*Id.* at PageID 145 (the "Incident").)  Chandler and the Assailants engaged in a physical altercation. (*Id.*)

A corrections officer placed a medical emergency call and escorted Chandler to the HCCF's clinic, where he received medical care.  (*Id.* at PageID 146.)  Chandler alleges that he should have been transported to an outside hospital, but "transportation officers had went [sic] to some nearby retirement party somewhere in the community and were inebriated and unable to return."  (*Id.*)  While waiting for transport in a hallway, Chandler alleges overhearing "radio chatter" that approximately five life flights were landing at HCCF and Whiteville to transport drug overdose prisoners to the hospital.  (*Id.* at PageID 147.)

Chandler was transported to a hospital nine (9) hours later.  (*Id.*)  On arrival at the hospital, a doctor examined Chandler's wounds.  The doctor told Chandler his wounds could not be stitched because they had already begun to heal.  (*Id.*)

Chandler alleges that he sustained leg "injuries" and "blows to his face" during the Incident.  (*Id.*)  Chandler alleges that, as a result of the Incident, he now has temporomandibular joint disorder ("TMD"), suffers from acute pain and jaw popping when he eats, and experiences sporadic and uncontrollable aching in his jaw when at rest.  (*Id.*)  Because of the Incident, he has a limp and experiences pain and weakness when walking.  (*Id.*)  Chandler has leg scars, pain in his calf muscle, and an uncomfortable and restrictive tightening in his calf muscle because of injuries he received during the Incident.  (*Id.*)

Chandler alleges that he was charged with fabricated disciplinary violations because of the Incident.  (*Id.* at PageID 148.)  Chandler alleges CoreCivic and TDOC have a practice of hiding violence and disguising fentanyl overdoses as "offender illnesses" within their facilities to achieve higher scores during audits to make their facilities "look better."  (*Id.*)

Chandler alleges that, on May 17, 2022, security officer Hurt at HCCF approached Chandler's segregation cell, admitted to Chandler that Chandler was not "suppose[d] to be at this institution [HCCF]", and told Chandler he would be on the next available transport bus to RMSI. ((*Id.* at PageID 148-149.) On May 19, 2022, Chandler was transferred to the RMSI. (*Id.* at PageID 149.) Chandler filed a grievance on May 20, 2022, about "his treatment by [WTSP] officials", but he has received no response. (*Id.*)

## VI.    <u>ANALYSIS</u>

### A.    GROSS NEGLIGENCE CLAIMS AGAINST HCCF DEFENDANTS IN THEIR OFFICIAL CAPACITIES

Chandler alleges that Hill was "grossly negligent" because he:

(1) "owed [Chandler] a statutory and constitutional duty to provide adequate health care to [Chandler]… includ[ing] providing adequate and reasonable transportation to an area hospital" (ECF No. 11 at PageID 155); and

(2) "he failed to provide the necessary transport officers…[b]ecause Warden Hill's transportation officers were allowed to drink alcoholic beverages while on call and working under the color of state law. [Chandler's] injuries [from the Incident] were not treated in time." (*Id.*)

Chandler alleges that Maynard was "grossly negligent" because she "owed [Chandler] a state constitutional and statutory duty to protect him from the foreseeable risk to his life and personal safety after being made aware of that risk, but failed to explore all options available in order to avoid that risk when she knew that an active [i]ntelligence [a]lert prohibited [Chandler] from being at [HCCF]." (*Id.* at PageID 153-154).

Chandler alleges that Cochran was "grossly negligent" because he "owed [Chandler] a state constitutional and statutory duty to protect him from the foreseeable risk to his life and personal safety. (*Id.* at PageID 154) Chandler alleges Cochran took no steps to ensure incoming prisoners were "reasonably compatible" with current prisoners at HCCF and failed to ensure Chandler was housed in a safe and secure cell. (*Id.*)

13

Chandler's allegations that Maynard, Cochran, and Hill are guilty of gross negligence are claims that they violated Tennessee law. (*Id.* at PageID 153-156.)

Under 28 U.S.C. § 1367(a), "[i]f there is some basis for original jurisdiction, the default assumption is that the court will exercise supplemental jurisdiction over all related claims." *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 716 (6th Cir. 2012) (quoting *Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 892 (6th Cir. 1998)) (internal quotation marks omitted). Section 1367 grants district courts broad discretion in exercising supplemental jurisdiction over related state law claims. *See Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010). Courts should "weigh several factors, including 'values of judicial economy, convenience, fairness, and comity.'" *Id*. at 951–52 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)) (internal quotation marks omitted).

Chandler's federal claims are being dismissed, and it is not in the interest of judicial economy or comity for the Court to hear and determine Chandler's state law claims. The Court DECLINES to exercise supplemental jurisdiction over Chandler's claims arising under Tennessee law. Chandler's state law claims against Maynard, Cochran and Hill in their official capacities are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c)(3).

## B.    FAILURE TO PROTECT CLAIMS AGAINST WTSP DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES

Chandler alleges that Fine "knew of the foreseeable risk to [Chandler's] life and personal safety that would result if [Chandler] were to be shipped to [HCCF]." (ECF No. 11 at PageID 150.) Fine knew of the intelligence alert that "forbade" Chandler's transfer to HCCF. (*Id.*) Fine knew of the "danger that awaited [Chandler] because Fine had personally sent the Chief of the enemy gang and the rest of the Traveling Vice Lords, whom [Fine] knew where (sic) hostile enemies of [Chandler]." (*Id.*) Fine "was deliberately indifferent to, and showed a reckless disregard for that safety, and failed to act reasonably in response to that danger when he instructed

Ivory to send [Chandler] to [the HCCF], where he knew rival gang members were housed and would cause harm to [Chandler]." (*Id.*)

Chandler alleges Fitz "knew of the foreseeable risk to [Chandler's] life and personal safety that would result if [Chandler] were sent to [HCCF]. (*Id.*) "[A]s the final approving authority for [Chandler's] transfer, [Fitz] knew of the [i]ntelligence [a]lert that existed and forbade the transfer of [Chandler] to [HCCF]." (*Id.*) Fitz "was deliberately indifferent to, and showed a reckless disregard for [Chandler's] safety, and failed to act reasonably in response to that danger when he approved [Chandler's] transfer to [HCCF][,] where he knew rival gang members were housed and would cause harm to [Chandler]." (*Id.* at PageID 151.)

Chandler alleges that Ivory "knew of the foreseeable risk to [Chandler's] life and personal safety that would result if [Chandler] were to be shipped to the [HCCF]." (*Id.*) Ivory told Chandler on May 14, 2022, that Chandler could not be transferred because of the intelligence alert that forbade Chandler's transfer to HCCF. (*Id.*) Ivory verified Chandler's contentions with Fine within Chandler's hearing. (*Id.*) "Instead of adhering to the [i]ntelligence [a]lert …Ivory was deliberately indifferent to, and showed a reckless disregard for [Chandler's] safety, and failed to act reasonably in response to that danger when he completely ignored all security protocols and the present danger to [Chandler's] life and safety and sent [Chandler] to [the HCCF][,] where he knew rival gang members who were sent by WTSP officials were housed and would cause harm to [Chandler]." (*Id*. at PageID 151-152.)

Chandler alleges that Jones "knew of the foreseeable risk to [Chandler's] life and personal safety that would result if [Chandler] were to be shipped to the [HCCF]." (*Id.*at PageID 152.) Chandler told Jones on May 14, 2022, that Chandler could not be transferred because of the intelligence alert that forbade Chandler's transfer to HCCF. (*Id.*) Jones knew of the many conversations Chandler and Fine had concerning Chandler's incompatibility with Traveling Vice

Lords members. (*Id.*) Jones knew that Chandler was not supposed to be transferred and told Chandler that the intelligence alert had been "circumvented" to place Chandler in "jeopardy." (*Id.*) "Jones was deliberately indifferent to, and showed a reckless disregard for [Chandler's] safety, and failed to act reasonably in response to that danger when he completely ignored all security protocols and the present danger to [Chandler's] life and safety and sent [Chandler] to [the HCCF][,] where he knew rival gang members were housed and would cause harm to [Chandler]." (*Id.*)

Chandler alleges that Macklin "knew of the foreseeable risk to [Chandler's] life and personal safety that would result if [Chandler] were to be shipped to the [HCCF]. (*Id.* at PageID 153.) Chandler told Macklin on May 14, 2022, that Chandler could not be transferred because of the intelligence alert that forbade Chandler's transfer to HCCF. Instead Macklin was deliberately indifferent to, and showed a reckless disregard for that safety, and failed to act reasonably in response to that danger when he assisted in extracting [Chandler] from his cell and under threat of bodily injury, for the sole purpose of sending him to [the HCCF][,] where he knew rival gang members were housed and would cause harm to [Chandler]." (*Id.*)

## VII. **FAILURE TO FOLLOW POLICY**

Chandler's allegations are liberally construed to allege the WTSP Defendants violated TDOC policy by failing to follow the intelligence alert prohibiting his transfer. (*See id.* at PageID 149-156.) Even if the WTSP Defendants failed to follow TDOC policy, Chandler does not state a claim of constitutional magnitude. An inmate's allegation that correctional officials failed to follow a correctional facility's administrative policies does not by itself rise to the level of a constitutional violation. *Laney v. Farley*, 501 F.3d 577, 580 n.2 (6th Cir. 2007). After the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995), mandatory language in prison regulations does not create a liberty interest protected by the Due Process Clause. *See Rienholtz*

*v. Campbell*, 64 F. Supp. 2d 721, 728–30 (W.D. Tenn. 1999), *aff'd*, 198 F.3d 247 (6th Cir.

1999) (citing *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995)).

Section 1983 does not provide a remedy for violating state laws or regulations.  *Lewellen*

*v. Metro. Gov't*, 34 F.3d 345, 347 (6th Cir. 1994); *see also Storm v. Swiger*, No. 4:07 CV 2387,

2007 WL 3171491, at *3 (N.D. Ohio Oct. 29, 2007) (finding a violation of a prison regulation is

not actionable under § 1983) (citing *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir.

1993), *overruled in part on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995)).

Chandler does not have a constitutional right to have prison personnel follow TDOC's policies.

### 1.  <u>FAILURE TO PROTECT</u>

Chandler's Amended Complaint against Fine, Ivory, Jones, Macklin, and Fitz in their

individual capacities (*see id*. at PageID 126-127.) for failure to protect, fails to allege facts stating

a claim to relief.

"[T]he treatment a prisoner receives in prison and the conditions under which he is

confined are subject to scrutiny under the Eighth Amendment."[6]  *Rhodes v. Michigan*, 10 F.4th

665, 673 (6th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  The Eighth

Amendment requires prison officials to "take reasonable measures to guarantee the safety of ...

inmates."  *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).  A prison official is liable under the

Eighth Amendment for failure to protect an inmate when: (1) the deprivation alleged is,

objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the

inmate's safety.  *Farmer*, 511 U.S. at 834.  For the objective prong, a plaintiff must demonstrate

that "he is incarcerated under conditions posing a substantial risk of serious harm."  *Bishop v.*

*Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Farmer*, 511 U.S. at 833).  For the subjective

---

[6]  Chandler was a convicted inmate at the time of the Incident.  (*See* https://foil.app.tn.gov/foil/details.jsp (TDOC website showing that Chander's sixty-year sentence for first degree murder was imposed June 4, 2001) (last accessed Feb. 18, 2025).

prong, a plaintiff must show that a prison official "kn[ew] of and disregard[ed]" that risk. *Farmer*, 511 U.S. at 837). *See also Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (a plaintiff seeking to assert an Eighth Amendment claim for failure to protect the plaintiff from other inmates "must show that the prison officials acted with 'deliberate indifference' to a substantial risk [of] serious harm").

Chandler fails to satisfy either prong of a claim under the Eighth Amendment for failure to protect.

### a.    EIGHTH AMENDMENT'S OBJECTIVE PRONG

Chandler alleges that he "now has TMJ (temporomandibular joint disorder) … [d]ue to the blows [he] sustained to his face [during the Incident]." (ECF No. 11 at PageID 147.)  Several courts have held that temporomandibular joint disorder causes substantial pain and suffering and can satisfy the objective prong under the Eighth Amendment. *See*, *e.g.*, *Nelson v. Jong Choi*, No. 15-13101, 2016 WL 8708468, at *4 (E.D. Mich. May 6, 2016) (internal citations omitted). Chandler, however, alleges no facts about the symptoms and pain, if any, from temporomandibular joint disorder other than "acute pain" and "popping" when he chews, and "sporadic and uncontrollable aching" in his jaw when at rest. (*Id.* at PageID 147.)  There is nothing in the record from which to infer that the vaguely alleged temporomandibular joint disorder "pain" that Chandler alleges he suffers (*see* ECF No. 11 at PageID 147) qualifies as "substantial pain and suffering" for the purpose of the Eighth Amendment's objective prong. *See Nelson*, 2016 WL 8708468, at *4.

Chandler also alleges generally that he suffered leg injuries, "blows to his face", and leg scars, and that he limps. (ECF No. 11 at PageID 147.)  Chandler alleges he experiences "pain and weakness" when walking. (*Id.*)  The complaint alleges no facts about, dates, diagnoses, or treatments for the leg injuries, facial "blows", leg scar, or "limp."  Without those facts, there is

nothing in the record from which to plausibly infer that such injuries are sufficiently serious for purposes of the Eighth Amendment's objective prong.

### b.    EIGHTH AMENDMENT'S SUBJECTIVE PRONG

Chandler alleges that: (1) he told Fine on May 11, 2022, that Chandler had "concerns for his safety [if] he were sent to one of the CoreCivic facilities" (*Id*. at PageID 134.)  Fine knew of the "danger that awaited [Chandler] at [HCCF] because Fine had personally sent [Johnny Peterson] and the rest of the Traveling Vice Lords" he knew were Chandler's enemies to HCCF.  (*Id.* at PageID 150.); (2) Chandler told Ivory on May 14, 2022, that Chandler "could not go to [the HCCF] because his life was in danger from rival gang members."  Chandler reminded Ivory that Chandler had an intelligence alert and could not be transferred to a facility where Traveling Vice Lords and Johnny Peterson were housed.  (*Id*. at PageID 138).[7]; (3) Chandler told Jones on May 14, 2022, that Chandler "could not be transferred to [the HCCF] because of the [i]ntelligence [a]lert" that forbade his transfer to HCCF because his enemies had been transferred there.  (*Id*. at PageID 152.); (4) Chandler told Macklin on May 14, 2022, that Chandler "could not be transferred to [the HCCF] because of the [i]ntelligence [a]lert" that forbade his transfer to HCCF because his enemies had been transferred there.  (*Id*. at PageID 153.); and (5) Fitz knew of the "foreseeable risk to [Chandler's] life and personal safety that would result if [Chandler] were to be shipped to [HCCF]."  (*Id*. at PageID 150.)  Fitz knew of the intelligence alert that forbade the transfer of Chandler to HCCF.  (*Id.*)  "[Fitz] also knew of the danger that awaited [Chandler] at [HCCF] because he and Fine had personally sent [Johnny Peterson] and the rest of the Traveling Vice

---

[7]  Chandler does not allege that he told Macklin about particular risks to Chandler's safety from inmates at the HCCF.  (*See* ECF No. 11 at PageID 141 (alleging only that Macklin entered Chandler's cell on May 14, 2022, to take Chandler to the WTSP's transport van).

Lords" to HCCF and Fitz knew they were Chandler's enemies.[8]  (*Id.* at PageID 151.)  Chandler's allegations are insufficient to satisfy the Eighth Amendment's subjective prong.

"[A]n inmate's communications about 'generalized safety concerns' or 'vague concerns of future assault by unknown individuals' are insufficient to provide knowledge that the inmate is subject to a substantial risk of serious harm …. 'In failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety.  Mere negligence (for example if a prison guard should know of a risk but does not) is not enough.'"  *Bradshaw v. Anucci*, No. 9:23-cv-0602, 2023 WL 4744735, at *18 (N.D.N.Y. July 24, 2023) (internal citations omitted).  "A policy of permitting members of different gangs to be housed together is not itself an Eighth Amendment violation.  It 'would place an unmanageable burden on prison administrators were they required to separate inmates by gangs.'  [A] [p]laintiff [must] show[] that [a defendant] had, or failed to act upon, particularized information that plaintiff's safety was at risk."  *Castillo v. WCC Superintendent*, No. 3:18-cv-05796, 2020 WL 1033663, at *4 (W.D. Wash. Feb. 4, 2020) (internal citations omitted).

Chandler's allegations about Fine, Ivory, Jones, Fitz, and Macklin's alleged failure to protect Chandler are materially similar to the plaintiff's allegations in *Gant v. Campbell*, 4 Fed. Appx. 254 (6th Cir. 2001). In *Gant*, the plaintiff, on learning of his impending transfer to another facility, told the defendants that "he feared he would be in grave danger of attack by gang members because his brother had been attacked at [the facility to which Gant was scheduled to be transferred]."  *Gant*, 4 Fed. Appx at 256.  A year after his transfer, Gant was attacked by gang members.  *Id.*  *Gant* held plaintiff had failed to state a cognizable claim for failure to protect

---

[8] Chandler refers to "Fine" in this allegation, presumably in error.  The allegation is in the "Claims against Warden Johnny Fitz" section of the Amended Complaint.  (*See* ECF No. 11 at PageID 151.)

because, "[a]lthough Gant expressed a general concern, he had not received any threats prior to being transferred, nor did he identify any particular gang members whom he feared." *Id.*

Chandler has alleged facts demonstrating that Fine, Ivory, Jones, Fitz, and Macklin knew Chandler was a member of a particular gang but, as in *Gant,* Chandler has not alleged that the Assailants were members of a gang, that the WTSP Defendants should have known Chandler would unexpectedly be placed in cell 205 at the HCCF on May 14, 2022, or that the WTSP Defendants should have known the Assailants would pose a risk of harm to Chandler.

The Amended Complaint does not allege the names of the Assailants, whether they were affiliated with a gang, or that the WTSP Defendants had knowledge of risks the Assailants posed to Chandler. The court in *Moore v. Olsen* found a plaintiff's showing that he was randomly assaulted insufficient to establish an Eighth Amendment violation. No. 17-2095, 2018 WL 4488910, at *2 (6th Cir. June 4, 2018); *see Miller v. Turner*, 26 F. App'x 560, 563-64 (7th Cir. 2001) (holding that prison officials were not liable under the Eighth Amendment when the plaintiff was randomly attacked by inmates who were not identified as potential security threats to him). Chandler's allegations about Fine, Ivory, Jones, Fitz, and Macklin do not, without more, establish a sufficiently culpable state of mind.

Chandler does not allege facts demonstrating Fine, Ivory, Jones, Fitz, or Macklin's: (1) subjective knowledge of a substantial risk that specific gang members at the HCCF would threaten, harass, or assault Chandler; or (2) disregard of that alleged risk. The complaint's allegations do not satisfy the Eighth Amendment's subjective prong for a claim of failure to protect.

Chandler's claim of failure to protect against the WTSP Defendants in their individual capacities is DISMISSED WITH PREJUDICE for failure to allege facts stating a claim to relief.

## VIII.  AMENDMENT UNDER THE PLRA

The Sixth Circuit has held that a District Court may allow a prisoner to amend his complaint to avoid a *sua sponte* dismissal under the PLRA. *Lucas v. Chalk*, 785 F. App'x 288, 291 (6th Cir. 2019) (citing *LaFountain v. Harry*, 716 F.3d 944, 951 (6th Cir. 2013) ("[W]e hold, like every other circuit to have reached the issue, that under Rule 15(a) a district court can allow a plaintiff to amend his complaint even when the complaint is subject to dismissal under the PLRA")); *see also Brown v. R.I.*, 511 F. App'x 4, 5 (1st Cir. 2013) (per curiam) ("Ordinarily, before dismissal for failure to state a claim is ordered, some form of notice and an opportunity to cure the deficiencies in the complaint must be afforded").  Leave to amend is not required where a deficiency cannot be cured. *Gonzalez-Gonzalez v. United States*, 257 F.3d 31, 37 (1st Cir. 2001) ("This does not mean, of course, that every *sua sponte* dismissal entered without prior notice to the plaintiff automatically must be reversed.  If it is crystal clear that ... amending the complaint would be futile, then a *sua sponte* dismissal may stand."); *Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir. 2001) ("We agree with the majority view that *sua sponte* dismissal of a meritless complaint that cannot be salvaged by amendment comports with due process and does not infringe the right of access to the courts").

Chandler has amended his claims previously in this cause.  The Court DENIES leave to amend again.

## IX.  APPELLATE ISSUES

Pursuant to Federal Rule of Appellate Procedure 24(a) and 28 U.S.C. § 1915(a)(3), it is CERTIFIED that any appeal in this matter by Chandler would not be taken in good faith.  If Chandler nevertheless chooses to file a notice of appeal, he must either: (1) pay the entire $605 appellate filing fee or, if he is confined at that time, (2) submit a new *in forma pauperis* affidavit and a current, certified copy of his inmate trust account statement for the last six months, in compliance with 28 U.S.C. § 1915(a)-(b).

## X.    <u>CONCLUSION</u>

For the reasons set forth above:

A.    Chandler's motion for extension of time (ECF No. 9) is GRANTED;

B.    The Court DECLINES to exercise supplemental jurisdiction over Chandler's state law claims and those claims are DISMISSED WITHOUT PREJUDICE;

C.    The Amended Complaint's claims against the WTSP Defendants in their individual capacities are DISMISSED WITH PREJUDICE in their entirety for failure to allege facts stating a claim to relief.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1)-(2);

D.    Leave to amend is DENIED;

E.    Because the Court has dismissed Chandler's Amended Complaint (ECF No. 11), Chandler's Motion for Mediation (ECF No. 10) and Motion for Status of Motion to Amend (ECF No. 12) are DENIED AS MOOT;

F.    The Court CERTIFIES that an appeal would not be taken in good faith and DENIES leave to proceed *in forma pauperis* on appeal; and

G.    This case is DISMISSED in its entirety.


IT IS SO ORDERED, this  <u>18th</u>  day of February, 2025.


/s/ *Samuel H. Mays, Jr.*
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE